May it please the Court, Deputy Attorney General Tiamata Costello appearing on behalf of respondents. I'd like to start by addressing the claim on the cross appeal, which is petitioner's claim of ineffective assistance of counsel at the penalty phase of this trial, specifically the California Supreme Court's reasonable adjudication of the prejudice prong of that Frickland claim, in light of the sum total of the aggravating and mitigating evidence that was presented not only at the trial, but also at the state court evidentiary hearing. While there was unpresented mitigating evidence adduced at the state court evidentiary hearing, there was also an abundance of additional aggravating rebuttal evidence that the jurors had not heard. That evidence included a lifelong history of violent conduct. Specifically, petitioner took several shots at a taxi cab driver while fleeing from the robbery murder that he and Freddie Square had just committed, and he nearly shot him in the head. That evidence also includes that he took- Are we now talking about the penalty phase? Yes, Your Honor. The evidence that the jurors had not heard, but which also could have been presented in rebuttal, included that he attempted to rob a laundromat, and during that incident, he grasped a woman around the neck and placed- Couldn't all that have been presented anyway? I mean, there was no legal impediment to presenting that evidence. That's true, Your Honor. It could have been presented, but that was not the prosecution's focus at the time, because at the time, penalty phase cases were much shorter, and he was focused very much on the absolutely heinous nature of the three murders, the rape and the sodomy. But we're assuming that we are at the time. What we are assuming is that, yes, that the original case in mitigation, or aggravation rather, would have remained the same. And we have, in this case, a very unusual situation where we have a penalty phase that we can look at from the state evidentiary hearing. So why are we limited to that? You're talking about the evidence that the prosecution could have presented in aggravation. Why is that relevant now? It's relevant now because if the defense had presented the mitigating evidence that he claims counsel should have presented, then that opens the door to all this additional aggravating rebuttal evidence, and so then you need to- So that would not have necessarily opened the door, would it? It would still have opened the door because at the time, there were not long penalty phase presentations, and the defense did not present this evidence, so there was no reason at the time for the prosecutor- But open the door usually is a legal concept, right? You couldn't have presented this earlier because there were evidentiary limitations. But if you said X, then that would open the door. And that's usually the context in which the cases have taken the- looked into possible different aggravating evidence, not simply that the prosecutor may have decided to litigate differently, which is what he could have done before. Yeah, and I think that the way that the California Supreme Court reasonably approached this was to look at the penalty phase that actually occurred. I mean, just to make sure that I understand your argument, you're not suggesting that the new evidence to which you're referring now would have been rebuttal evidence specifically directed to the new mitigating evidence, but rather there would be additional aggravating evidence, right? No, Your Honor, we are- Who would have rebutted specifically? Well, the mitigating evidence that was presented covered three general categories. That was petitioner's family background and upbringing. And that would not have rebutted that? No, and in fact, at the evidence you're hearing, there were no witnesses presented to specifically rebut that. Then there was the Alabama institutional conditions and experiences that Andrews had there. And so that is the mitigating evidence that was also presented. And then there was the mental health expert testimony. And so what the California Supreme Court reasonably did was look at all of this mitigating evidence that was presented and found that in response, in rebuttal, the prosecutor could have put on this long list of additional crimes that Andrews committed now that he is putting his entire background and life history at issue. And so that includes, like I was saying, the shots that he took at the taxi cab driver, the hostage taking- So none of that would be rebuttal in the sense of rebutting any of the mitigating evidence, like disproving any of the mitigating evidence, right? It would just be other evidence that they would try to persuade the jury with? Correct, Your Honor, and that's the way that the penalty phase in the California law, that's how that would work. It's not necessarily to disprove a specific thing. I mean, he could have done that, but that's not the way that the- except for the mental health testimony, that's not the way that the penalty phase at the state court hearing played out. It was more in the sense of once the petitioner puts certain things into issue, like his background, and argues that because of my background, I am less morally culpable for these three heinous murders, rape and sodomy, then the prosecution has the opportunity to present this kind of evidence in response. And so the California Supreme Court ruled that under California law, this was admissible evidence, and it would have been presented in response. Sure, and it could have been presented in the first instance. You're just saying at the time the custom was different. Correct, Your Honor. But why is that relevant as we look at it now? I mean, we don't look at- you said there may be a custom that people didn't put on much of a penalty phase defense, but that doesn't make it acceptable under the Sixth Amendment. I'm just- I think we're maybe talking past each other, but just so I understand your argument, there's- everything that you've just cited and you said in your briefs could have been presented in the penalty phase by the prosecution in the first instance, correct? Except for perhaps the mental health evidence, which was a direct response to the mental health experts that the petitioner presented. But in terms of the other crimes, absolutely, under Factor B, the prosecutor could have done that. But as he testified at the hearing, he did not believe that was necessary. I get your point. He also testified that he wouldn't- given the opportunity, he probably would not have introduced that evidence. That's not exactly how all of his testimony played out, Your Honor. In fact, when he was cross-examined and he was specifically asked about at least two of these incidents, he expressly left the door open to possibly presenting that evidence. I thought he said, I probably would not. During his direct, he gave a general, broad statement that he probably would not have introduced additional facts. But then when he was asked very specifically on rebuttal, well, what about the Woodall shooting? Would you have presented evidence of that? And he said, I may or may not have done that. And we need to remember that when he testified, he has not sat through all of the evidence. He has not listened to the witness testimony. He has not looked at the exhibit. The California Supreme Court did, as I understand it, with respect to what he said. They said, essentially, it doesn't matter what he said. We don't credit it. Well, they said two things. The first thing they said was, and it was what the referee also said, which is if any defense attorney had presented in excess of 50 witnesses describing this broad range of background mitigating evidence, any prosecutor would have responded to that. And so the court is saying that in any case, when the defense presents all these witnesses, the prosecutor is not going to just sit back and not respond. That just defies reality. And then the court said, in addition, we also find that Ferns' testimony is not necessarily inconsistent with that because, and the court must be referring to what played out during cross-examination, because he only disclaimed, apparently, calling witnesses to rebut the prison evidence. And, in fact, that is how it played out, again, as a state evidentiary hearing. The state did not try to refute with additional witnesses the conditions and the experiences that Andrew suffered. But that's the key evidence, isn't it? It is. But the question, then, is what else can the prosecutor bring in and add to the aggravating side of the scale? And so that, again, includes this laundry list. How do we weigh this evidence? So let's suppose that counsel had chosen, that defense counsel had chosen a different strategy and had presented lots of stuff on mental health, the conditions that Mount Meigs and his family end up bringing. And then the prosecutor said, okay, well, if he's going to do that, if he's going to play that way, I'm going to introduce all of this other aggravating. How do we weigh that, and what standard are we measuring that against? Are we measuring it against the one-juror standard that comes out of Wiggins? No, Your Honor. And what the court would do in that situation is look at all of the mitigating and aggravating evidence, and because this is an epic case, the only question is whether or not there's room to reasonably debate how the California Supreme Court ultimately struck that balance from the perspective of the jurors. And so the just one-juror language in Wiggins stems from a Maryland law, because Wiggins arises out of Maryland, that doesn't allow penalty retrials. If there's just one juror who votes for life, then that's basically the end of the proceedings. The state does not thereafter have an opportunity to seek the death penalty. That's not the law in California. What is the law in California? In California, the law is it's a hung penalty trial, and the state has the option to retry the defendant on penalty. And they can continue to do that until... But why does that matter for our purposes? I don't understand that. Well, the question was... The question is whether this penalty determination is to be valid or isn't. What might happen after that isn't the question, is it? Well, Your Honor, I was responding specifically to the question about the just one-juror language. Why is it still the just one-juror standard, even if you can do it again? Because it's not a more favorable result if the result is just to do it again. So if we do it again and he's then sentenced for death... Do they think it's more favorable or they wouldn't be asking for it? Well, no, Your Honor. They're hoping that ultimately, at some point, it's more favorable. But to just say we're going to retry the penalty is not a more favorable result. It's simply an extension of the proceedings where we're retrying penalty perhaps another time. Do you try that before another jury? You can't try it before the same jury, right, if they hung on penalty? That's probably correct, Your Honor. Do you have to redo the guilt? No. Guilt wouldn't have to be redone, but the prosecution could certainly rely on the evidence. We're doing it presumably with a non-constitutionally ineffective counsel this time. Right. Or, I mean, we're assuming here that there was constitutionally ineffective assistance counsel, as I understand it, because we're just talking penalty phase. So, therefore, you're going to try it again, A, you get a second shot, B, with a non-ineffective counsel. I'm not conceding that there was sufficient performance in this case, but regardless of all that, at the end of the day, the question is, and what the California Supreme Court needed to decide, is whether or not there's a reasonable probability of a more favorable result. I have a more generic question about that. The California Supreme Court, I mean, never really focused on that question, on the penalty question. Basically, it was discussing the ineffectiveness prong. Occasionally, it wandered, when it was discussing some of the other cases, into saying that there wasn't prejudice. But did it ever really decide that? Yes, it did, Your Honor. At the beginning of the opinion, the court expressly said that it's finding neither deficient performance nor prejudice. But the whole discussion is not directed at the prejudice. Well, it's an overlapping discussion because the court discusses the double-edged nature of a lot of the evidence, and then when it gets to the prejudice analysis, which is on page 1259 of the opinion, it says, for the same reasons, it is not reasonably probable Petitioner was prejudiced by counsel's rejection of a particular defense, in light of the ambiguous nature of some of the mitigating evidence and the substantial potential for damaging rebuttal. So after having analyzed all of the evidence, all of the mitigating evidence that was- Whether it's reasonably probable that the sentencer would reach a different outcome after weighing all of the available mitigating and aggravating evidence, that's not how they state it. That's exactly, Your Honor, the language that the court uses. For the same reasons, it is not reasonably probable, the court then quotes Strickland at page 694, that Petitioner was prejudiced. No, but they don't say that they would reach a different outcome after weighing all the available mitigating and aggravating evidence. And so I'm just trying to figure out what's the impact of not using that language when, you know, reviewing the deficiency analysis and just kind of saying, therefore, the prejudice analysis is the same. Your Honor, I think it's very clear from the court's opinion that it has weighed all of the evidence, and it ends by referring to the mitigating evidence and the damaging rebuttal evidence. And the court has gone through all of the evidence presented- But they didn't re-weigh it like the panel did, the panel majority or the dissent, did they? Yes, the court has weighed the evidence. But they didn't go back and forth and weigh it. In terms of discussing it in a particular order, I don't believe that there's a Supreme Court case that says, when the state court issues its opinion- What kind of order did they do it in? Well, the court started with the prejudice prong, with the deficient performance prong, and then weighed all of the evidence. And then the court decides that when we look at all of the mitigating evidence and all of the aggravating evidence, we don't think it's reasonably probable that the jurors would have reached a more favorable result. That is exactly and all that Strickland requires. And so the court reasonably applies the Strickland test in considering all of this evidence. There's nothing in the opinion that suggests that the court is not weighing or considering all of the mitigating or aggravating evidence in the case. Let me ask you a question about the referee. It seemed to me that the court was concerned at some point that they needed to understand all of the evidence that might have been presented, which probably were looking at the first prong of the test. In other words, they were looking at all of the mitigating evidence that might have been put together. And then they were moving to the second part of the test because they were trying to weigh the aggravating evidence, along with any rebuttal evidence that could have been produced, and then re-weighing the both against each other. And they called the referee to answer some questions. Is that how that came up? Yes, Your Honor. And as a matter of fact, that also supports the fact that the court weighed all of the evidence. Just a minute before you get to the conclusion. It's my understanding then that the court asked the referee to answer six questions aimed at making this analysis. In other words, what was the mitigating evidence? What steps counsel took and could have taken to secure the evidence? What constraints counsel had, tactical, financial, or those imposed by his client? What damaging evidence could have been presented in rebuttal? And then went through this analysis. And that was what they asked the referee to do, correct? That's exactly correct, Your Honor. And after the referee made that determination, then the court weighed in on whether they agreed with the referee, correct? Yes, Your Honor. So if that happened and if I suggest that the Supreme Court did not get it right or I agree that the California Supreme Court unreasonably applied on the performance prong, what deference do I owe on the prejudice prong under AEDPA? Each prong is individually reviewed under AEDPA as long as there is a merits determination on each prong. And in this case, we do have a merits determination on each prong. So even if an either prong would be fatal, if Petitioner fails on either prong, that would be fatal to his claim. Do I have a double deference to apply? Absolutely, Your Honor. The only question that's now before the court is whether or not it's reasonably debatable that the California Supreme Court could have struck the balance that it did between all of the aggravating and all of the mitigating evidence. And going back— But now, just a minute, maybe you misunderstood my question. It seems to me that if I'm talking about whether counsel was in fact— whether the counsel reasonably performed, I'm going to give counsel some deference before I even begin to get to the Supreme Court's determination. And then when I get to the Supreme Court's determination, I'm going to say they get deference as well. So when I'm looking at the prejudice prong, do I again give the double deference that was due on the performance prong? Your Honor, the performance prong is unique in the sense that there's a presumption of competence already, and because of that presumption of competence, there is double deference. On the prejudice, we don't have this presumption. The court simply asks whether or not there's room to reasonably debate the California Supreme Court's ultimate conclusion, which does build in the reasonable probability test from Strickland. All right. Just give me the site for where they use the reasonable probability. Certainly, Your Honor. I'm looking and looking and I'm missing it. If you could give us the page number of the opinion or the ER site or something. The pages you were giving us, I don't have. Let me get that page number of the opinion would be good. I believe that in the analysis section, the court does talk about that at the very beginning. I believe there's a sentence that does not state the standard just as it was not precious. Okay. Now, where's the other one? I believe that the one page I was just referring to was page 1259. What page of the opinion is that? Yes. So it's 28 Cal Forest, 1259. 1259. And the court also, at the very beginning, introduces the opinion, as I recall, by saying that it finds neither deficient performance or prejudice. I don't see it at 1259. Are you talking about the opinion that says for the same reasons it is not reasonably probable and then citing the Strickland petitioner was prejudiced by counsel's rejection, talking about that? Correct, Your Honor. But what I find difficult to grasp in this majority opinion from the California Supreme Court is that after that very brief discussion of prejudice, the majority opinion then goes on to compare the facts of this particular case or counsel's performance in this particular case to a series of other cases. And all of that comparison was done for purposes of determining whether counsel's performance was deficient, that is, whether it's within the range of reasonableness. I don't see in the majority opinion going back to specifically analyze the prejudice prong. Other than that passing reference, then it goes back to focus again on whether counsel's performance fell within the reasonable range standard, and it undertook that analysis by comparing it to all these cases. Was there somewhere else later on in the opinion where the majority opinion pivots back and specifically analyzed the prejudice prong under Strickland? Your Honor, I don't believe the Court later repeats its finding that there's no prejudice, but when it says for the same reasons, that's referring back to cases. But the reason was that it wasn't constitutionally ineffective. What they never seem to have done is to say, assuming it was constitutionally ineffective or if it was constitutionally ineffective, it still wasn't prejudicial, because the reasons they gave before were all about why it wasn't constitutionally ineffective. What about page 1265? With respect to the question of prejudice, in addition to the reasons previously discussed, the record here contains no indication the jury was inclined to sentence Petitioner to life imprisonment and might have been persuaded by additional or alternate mitigation evidence. Correct, Your Honor. And that was a comparison to another case in responding to the Petitioner's argument, but the Court is saying that it is making the prejudice finding, and even though the initial pages refer to the deficient performance analysis, the Court does discuss the double-edged nature of the mitigating evidence, what damaging rebuttal evidence would have been produced. And so there's a great deal of overlap in the Court's discussion. It's not that the first several pages are strictly and only limited to whether or not counsel performed efficiently and that the second half of the opinion is strictly and only limited to the prejudice analysis. There's a great deal of overlap because of the damaging rebuttal that came in, because of the double-edged nature of much of the evidence, but the Court does, and it does on that page also make clear that the Court is saying this would not probably have made a difference to the verdict because of the tremendous amount, not only do we have three heinous murders, a rape and a sodomy, unnecessary suffering by the victims, torture as admitted to by his own experts, but then if there had been a case in mitigation presented like the one Petitioner presented at the state hearing, we also have the evidence of shooting, taking hostages, stabbing inmates, a diagnosis of antisocial personality, which his own expert said is the same as a sociopath and described such a person as someone who has no conscience. All of this is devastating rebuttal evidence, and when we put all of that evidence on the aggravating side of the scale, even though there was some unprecedented mitigating evidence, as the California cases that we mentioned show, even when jurors have considered similar and comparable evidence and even more mitigating in the sense that it's So it can't be said that in a case like this, the unprecedented mitigating evidence would necessarily outweigh the tremendous amount of aggravating evidence that we have in this case. I'm sorry? Whether it would necessarily outweigh isn't a standard. Yes, under ESSA, the question is whether or not it was reasonable, whether or not it's even open to debate, reasonable debate, whether or not the California Supreme Court could strike the balance that it did between the mitigating and aggravating evidence. When I read Williams and Wiggins and Rompilla, I see some language that the court uses, and then I read Penholster, and Penholster was decided after Williams, Wiggins, and Rompilla, and I see lots of sites to those cases, but then reading Penholster, would you suggest that Penholster makes it harder for a habeas petitioner to show prejudice than it does in Williams, Wiggins, and Rompilla? Well, in Williams, for example, that's only a performance case. I understand. And the other cases are post-ESSA cases, and in Wiggins, the Supreme Court did not even review the prejudice prong under ESSA at all. So the Supreme Court has said cases like that offer no guidance in deciding whether or not a state court has unreasonably applied Supreme Court law, and absolutely Penholster makes clear that it's a very, very high burden that a petitioner has to meet in order to show that it was unreasonable for the state court to reach the conclusion that it did. But isn't that debatable whether prejudice analysis would be de novo or under ADPA review? Because if I recall, in the Williams case of both Justice O'Connor and Justice Stevens, that under either way, either clearly if it was contrary to clearly established law or unreasonable application of clearly established law, the evidence of the horrible childhood that this person had, Williams had, should have come in. The court in Williams, I believe, did not actually reach the prejudice analysis, and so in this case, as long as it's reasonably debatable, then under ESSA the petitioner can't obtain relief. And in Williams, the aggravating rebuttal evidence was quite mild to what we have compared in this case and in Williams. He was severely and repeatedly beaten by his father, and he was borderline mentally retarded. We don't have that kind of mitigating evidence in this case. Well, he wasn't beaten by his father. He was beaten by the people in the institution, but he was beaten as a child. Not as a child, Your Honor. Fourteen years old as a child? Fourteen years old as not a child? In his young teenage years, Your Honor. Oh, I'm sorry. And in Williams, this was in the home. And so there are some distinctions. It's not to say that the mitigating evidence that the petitioner presented doesn't carry some weight. It most certainly does. There's language in Williams that does seem quite applicable here that the California Supreme Court may have dismissed out of hand. So in Williams, they noted that Williams was among the inmates least likely to act in a violent, dangerous, or provocative way. I'm quoting from the California Supreme Court, quoting Williams. And yet that is exactly what the special master found, that Andrews was not violent in prison, that he was more likely to be a prey than a predator, and that he actually handled the prison situation quite well. But why isn't that the kind of evidence that would show an unreasonable application of Williams? It's not unreasonable because we need to balance all of the evidence. And the California Supreme Court found that even with respect to Williams. The California Supreme Court didn't even discuss the special master's findings on this point. That would have been in contradiction to Williams. I believe that they're in the court's initial summary. But the court found that that evidence was double-edged because Petitioner also demonstrated a willingness to resort to violence when it suited his ends. And so the court referred to the prison stabbings that Petitioner committed. No, Your Honor, the stabbings were planned knife attacks that were not in the middle of an incident. And still the point is that when you bring the inmates into the equation in terms of the evidence, they're going to present some mitigating evidence, absolutely. But on the other hand, there's also going to be some aggravating evidence that does come in, including the stabbings, including all these other incidents of violence, and including the very damaging mental health expert testimony that we saw. I'm going to switch to Silva. I mean, Silva, another horrible crime. There's torture, multiple murders. And we found ineffective assistance at counsel at penalty phase. And the mitigating evidence in that case was not as strong as it was in this case. Your Honor, I don't know if the court applied EDPA in the Silva case. But if it didn't, then that makes the difference. And cases can go either way. There are California cases that we cited where the jurors were presented with childhood, physical, and sexual abuse, where the aggravating evidence was not as great, and they still returned a verdict of death. And the point of all that is just to show that it's at least reasonable for the California Supreme Court to look at the evidence in this case, a tremendous case in aggravation. And, yes, there is mitigating evidence that wasn't presented that could have been. But when you weigh it against the aggravating evidence on the other side, it's at least room to debate what the petitioner would have to show, is that there was only one way for the California Supreme Court to look at all of this evidence, and there's quite a bit of evidence. And there was only one way for the court to strike that balance. And there's just too much aggravating evidence for that to be the result. There's no Supreme Court case that has confronted this much the magnitude and seriousness of this kind of aggravating evidence. And, as I mentioned, there are California cases that have gone the other way. So that shows. So if I could interrupt just a second. You're running out of time. But basically your position is there's nothing he could have done. There was a foregone conclusion. This is one of the cases. There was nothing he could have done in mitigation to spare himself from the death penalty. I'm not saying there is nothing he could have done. What I'm saying is that it's at least reasonably debatable, considering the horrific crimes and all the other aggravating evidence in each case needs to be assessed on its own merits. And in this case, there's at least room to debate how the California Supreme Court struck that balance. There isn't just one answer. Thank you. We'll give you a little extra time for rebuttal. And before you start, just to make sure we're clear, if you end up using all of your time on defense or if you want to spend some time on your main theory, but if they don't rejoin, then you won't get rebuttal either. So I'll leave the time management to you in your wise hands. May it please the Court, Michael Burt for Mr. Andrews appearing with me as statement senior. I'd like to begin with Judge Smith's question on deference because I think it's a foundational issue here, which is what deference do you give to the California Supreme Court's decision if you assume that their performance evaluation was unreasonable? Correct. That was my question. Yes. And I think the cases answer that question. And I think what the answer is that if you find that there is a prong one unreasonable determination here, that you do not give deference at all to the decision. And that, I think, follows from Pennelly versus Quarterman. I guess I'd have a tough time with that one, given what I have in the language in Penholster. I mean, my worry is and I've seen your language and I read it and I think this is a close case. But if I look at Williams and I look at Wiggins and I look at Ronpilla, I can find myself in a situation where this person might, well, should maybe have been given this chance to go forth with some different result in the California Supreme Court. But then I go to Cullen versus Penholster. It seems to be a case dead on point with this case. The defendant only called the mother, declined the call of the psychiatrist who had diagnosed the defendant with psychopathic personality traits and antisocial personality disorder. The counsel's preparation was minimal, the court said. Instead of the deferential approach taken in those three cases I've cited, the court emphasized a strong presumption of competence, quoting Strickland. So I've got to give strong idea of competence to this counsel. I've got to emphasize his wide latitude given to his decision making. And then something that worried me, is there any evidence in this record that details what the professional standards were for defense counsel in a death penalty case in 1984? There is voluminous evidence from four different Strickland experts. There's also documentary evidence. Well, frankly, is there any reason? I mean, I look to try to find the professional standard because I was looking at the language which is in Penholster which says, it's outside counsel's reasonable professional judgment to conduct a more expansive investigation where there was no evidence that such an approach would have been inconsistent with the standard of professional competence in capital cases. And so I looked at all this and then I said to myself, is there anything in this record to show that what California Supreme Court determined about this was somehow unreasonable? Yes. What? There was testimony from four Strickland experts. There was documentary evidence that referred to the applicable standards of care at the time. Those documentary exhibits referenced the then-applicable ABA standards for the performance of the defense, which were the applicable 1980 standards. And that might... I'm sorry. I mean, where you're getting is to what that evidence is. But then the next question automatically comes, and that's exactly what the California Supreme Court focused in on. With having a referee look at the evidence, look at what the situation was, and then they had the opportunity to determine whether that was reasonable or whether it wasn't. And then me, on appeal, I'm supposed to say they were wrong. That's why I focused on the deference. If I'm to give them deference, the question's over. If I'm not to give them deference, even then it seems to me questionable. Well, I think you look, first of all, at the record to determine whether the conclusion on performance was reasonable. If you look at this record, what you see is a penalty phase, the evidentiary portions of which compose 20 pages of the transcript. And in real time, that was 19 minutes for the entire penalty phase of this case. The defense counsel's closing argument was seven pages. But frankly, what you're comparing with is what the defense did. But when you compare that in comparison to what the prosecution did in that similar type of a hearing, it wasn't much different. The prosecution gave a stipulation. Right. And rested. But this just didn't give anything about what the crimes were or what they entailed or what the whole situation was. That was the total. Yes. And on the other side, the defense did what they did. And then again, I'm looking back to, in 1984, what do California lawyers do? Because if I throw that in the middle of pinholster, it seems to me, and this is what California said, that in the 80s, prosecutors emphasized the circumstances of the crime instead of emphasizing the record. No factual evidence about professional standard. Plaintiff told counsel not to utilize mother or any relatives that he would disturb the proceedings. Plaintiff did not, or the counsel, your client did not tell counsel the conditions. And so they went through this to try to determine it and said, hey, based on this, we can't say there's prejudice. Judge, the California Supreme Court had determined in 1979, in People v. Pope, that the standard in California was the ABA standards. And that standard set out a basic investigative duty on counsel to do an investigation. There's nothing sophisticated about the standard. And if you look at this court's opinion in Bean v. Calderon, that discusses what the standard was at the time this case was conducted. And you compare that standard, reasonable investigation or thorough investigation, and these attorneys completely failed to meet that obligation. They did nothing to investigate mitigating circumstances. Nothing. That response does not address the prejudice prong that Judge Smith referred to. What's your position on the prejudice prong? The prejudice prong, Your Honor, is that if you look at the totality of the mitigating circumstances in this case, and you look at the aggravation, and also it's important, I think, to take into account the double-edged nature of the so-called rebuttal evidence that my adversary talks about here. In other words, it wasn't altogether clear that that was rebutting anything, rebuttal evidence. So you put that into the balance, and then you look at other comparable cases to see, first of all, what was the nature of this mitigation? How strong, how powerful was it? And if we look to past cases, evidence of rape, evidence of child abuse, evidence of racism, evidence of mental health disorders is powerful, classic mitigation. Well, so in your view, what is the Supreme Court case that was misapplied by the California court? I think the... On the prejudice analysis. On the prejudice analysis, I think Wiggins, I think Taylor. Isn't Wiggins post-California Supreme Court decision? It is, but the California Supreme Court took into... I'm sorry, the U.S. Supreme Court in Wiggins took into account the Taylor case, which had been decided after the state court opinion in Taylor. And I think from that, the rule has developed that it is appropriate. And in fact, the panel decision in this case said it was appropriate to take into account interpretations which post-state the state Supreme Court opinion. Your best case in response to Judge Rawlinson's question is Wiggins? Well, I think it's the whole line of cases, beginning with Taylor, Wiggins, Rompilla. All of the cases, the four cases that the U.S. Supreme Court has granted Edper relief on ineffective assistance grounds in a period of ten, nine years. The problem comes, I guess, counsel, and that's why I tried to get you here. If I read Wiggins and I read these cases that followed after Wiggins, I can get there. But when I get to Cullen, I can't get there anymore. Because Cullen had a similar circumstance, and we backed up on the Supreme Court. We said, now we're not talking about the same thing anymore, and we're talking about investigation again in Cullen v. Penholster. We said there's a strong presumption of competence. We said it emphasized a wide latitude. And then they said there's no constitutional duty to investigate. Instead, a court must entertain the range of possible reasons counsel may have had for proceeding as it did. The bottom line, as long as there's a plausible explanation, even with little investigation, a state court's determination that counsel's professional assistance was objectively reasonable is not an unreasonable application. I'm quoting their language. And so then I say to myself, okay, Wiggins didn't investigate, so let's think about what they would do if they had to investigate, what they would present. And then I say to myself, the California Supreme Court set a referee on all of that. Had the referee go through every bit of it and come to a reasonable determination based on that, and then made a decision about that. And they took into consideration all of that evidence. Yes, there may be some of us who would see it differently than they did. Frankly, the defense thought differently than they did. But just because we see it differently doesn't mean that we can undo it on adequate deference. If we had put mental health expert testimony, it would have been a battle of the experts. If we had put in the brutal treatment in the Alabama prison system, the acts of violence he committed while there and the crimes he committed to put in there would have come in. He forbid having family testimony for sympathy. If we had put the incarceration at Mount Meigs in the evidence, in Penholster, the jury interpreted that evidence to mean that the plaintiff was simply beyond rehabilitation. So every time I keep coming up with, it just offsets, and so I'm trying to figure out how I help you based on Penholster. Well, I'm not sure Penholster deals with a state court decision that is other than summary. And Richter makes it clear that the court is not to come up with post hoc rationalizations for counsel's conduct. That's exactly what the court did here. It says here, instead, a court must entertain the range of possible reasons counsel may have had for proceeding as it did. That's right, the language in Penholster. Well, I think if the court looks at that, and that's exactly what California did. Well, they did, but I can't reconcile that with the Supreme Court's discussion in Richter that says that you cannot hypothesize reasons for why counsel did something if they are inconsistent with the reasons that are in the record for why counsel did or did not do something. This counsel was very clear in his testimony that they did not do an adequate investigation. He never said, in fact, he said just the opposite to what the California Supreme Court hypothesized, which is that they had some aversion to using prisoner witnesses. And he was asked on cross-examination, would you have put prisoner witnesses on to support this defense? And he said absolutely. And he was asked, would you have put on a defense, a mitigation defense that was based on the racist aspects of the Alabama prison system? And he said yes, he would. In contrast to that testimony from the trial counsel, the California Supreme Court did not defer to that decision making. Instead, it made up its own theory that, oh, counsel must have an aversion to putting on inmates. And they also made an incorrect determination of the facts under D2 by saying that, well, counsel had to rely solely on inmates to put this mitigation evidence together. That was completely false. There was an abundance of evidence aside from inmates clear on the face of the record that could have been used to mount this defense. So what you're suggesting is that the language in Penholster that says that I and the court and the California Supreme Court have the duty to affirmatively entertain the range of possible reasons counsel may have had for proceeding in their investigation that they did, is limited when counsel says why he did it? Is that what you're asking me to do, to rule? That is what I'm asking you to rule. I don't frankly find any case law to suggest that. What it says is just the opposite. I'm to go find out what all the range of possible reasons may be. And that's why I came up with, well, I didn't come up with it. The California Supreme Court came up with it, all the range of possible reasons. And I just merely said, did they unreasonably apply the law, which is what AEDPA requires me to do. If AEDPA applies, the question here is... Even if AEDPA doesn't apply, I'm having a tough time understanding why what they did was wrong. Even if I went pre-AEDPA, I'd have the problem. You'd have the problem on the performance prong? I'm not sure I understand the court's question. The performance prong, I think, is a straightforward application of Strickland, which is in order to make tactical decisions, the lawyer first has to do an investigation. If they haven't done an adequate investigation, their decisions cannot be characterized as tactical. Let's look at what they did. On the eve of the first trial, they went to Alabama, where they knew that Mr. Andrews lived in Mobile. Instead of going to Mobile, they stayed in New Orleans during the Mardi Gras, and they spent one day leaving from New Orleans to Mobile and returning the same day around 5 o'clock in the afternoon. What did they do during that entire time? They went to the courthouse and they looked at records. The counsel also said that at one point they hired a taxi to drive around, but he specifically said that they didn't go to the defendant's house, and yet the California Supreme Court said they had gone to the house and made a determination that a poverty defense was not viable. That's completely contradicted by the record. That's the only investigation they did prior to the first trial. Prior to the second trial, again, in the midst of trial, not any prior investigation, without any investigator, they go to Mobile. Let me stop you just a minute, because it seems to me that on the performance prong, I owe double deference. Only time I get off the double deference, only time that I can get back to just single deference, is if I get to the prejudice prong. So California went through all of this stuff that you're talking about and said to themselves, okay, owing deference to the attorney, I don't find any performance deficit. Now even if I disagree with that, I still have to give deference then to them. And so if I disagree with both, then I go to prejudice. And again, I'm saying, and I hate to monopolize the question here, but I'm having a tough time understanding why I don't give deference to their opinion on prejudice. And secondly, because there's no case that says I don't. And secondly, why even if I don't give deference, they were wrong on the prejudice. Well, one reason we don't give deference to the prejudice prong was alluded to by Judge Bybee, which is they did not fairly take into account the complete range of mitigating evidence. And in particular... I understand you're saying this, and another reason was because they didn't seem to do it in the alternative. In other words, they seem to wrap in their performance prong analysis into the prejudice prong, thereby assuming the constitutional effectiveness of counsel in doing the prejudice prong. Correct, and I think that's an unreasonable application. Counsel, what Supreme Court case says that we look to the analysis of the state court and the thoroughness of it to determine whether or not we give deference to it. What case are you relying upon to support that argument? That you look to the Supreme Court's decision as opposed to a hypothetical? To the thoroughness of the analysis of the state court on the prejudice prong to determine whether or not we give deference to that decision. What authority are you relying upon for that proposition? Well, I think all of the cases... Give me the strongest one. The strongest one? And can that include AEDPA cases from this court? Well, I'm just curious about the proposition that we dissect the analysis of the state court before we determine how much deference we give to it. I'm just curious what case authority you're relying upon for that proposition. Well, I think the entire line of AEDPA IAC cases in the Supreme Court say that the proper form of analysis is to look at the totality of the mitigating and aggravating circumstances. But that presupposes we're doing it de novo. My question to you is what case says we don't give deference if the state court has failed to comply with your version of how the analysis must be done? I'm just curious about what case points us in that direction. Well, I think the latest case from this court that discusses and applies that rule is... But of course our cases aren't determinative in terms of our AEDPA deference, are they? Well, they're determinative on whether an AEDPA violation has occurred. And if you look at Judge Wynn's opinion in White v. Ryan, the central defect, which is 895, Fed 3rd, 641, just a couple of months ago, the central AEDPA defect identified there was the failure to collectively weigh and consider the mitigating circumstances in the aggregate. And that's the same, one of many defects that occurred here, which is they did not evaluate the totality of the circumstances. So if this case went to the United States Supreme Court, do you think the Supreme Court would rely on White v. Ryan in deciding this case? I think they would rely on the cases cited in White v. Ryan for the proposition that I just enumerated. And I think that if I could have a minute... I don't want to take your time. That's the problem. The rule is in assessing prejudice under Strickland, we re-weigh the evidence in aggravation against the totality of available mitigating evidence, and Ryan cites Wiggins for that proposition and also Strickland. So that would be the case that sets forth that principle, and it's a principle that's also consistent with Taylor, that you look at the totality of the mitigating evidence. And I'm sorry, I think I may have cut off Judge Berzon or somebody on this side. All I was going to say is that the statute itself says that the standards, whether it's contrary, true, or involved in unreasonable application of clearly established federal law, so if the wrong standard was applied, and this has always been something but anomaly in AEDPA law, if they say nothing, then you get to imagine that they did it right. But if they say something, you do look at what they did. And if what they did was not what they're supposed to do, then it's contrary to the clearly established federal laws determined by the Supreme Court of the United States. So, I mean, that's my understanding of where we are in terms of what the structure is. And I ask you for a Supreme Court decision, because I'm struggling with what Supreme Court decision says. If the balance is improperly struck by the state court, we no longer give deference to that decision. I was just wanting to have a case from the Supreme Court that says that clearly. And I want to be clear that I think the defect is not that the, well, the balance wasn't properly struck, but structurally the problem is that in conducting the balancing, they did not put on the mitigation side of the scale everything that should have been there in doing their weighing. And when that happens, you've got an AEDPA problem. Are you arguing either or or both? That AEDPA doesn't apply to the penalty phase determination, it does apply to the penalty phase determination, or it doesn't apply, but even if it did apply, you'd still say it's unreasonable. I'm arguing both. In other words, I'm adopting the position of the dissent, which is even if we assume that AEDPA deference is owing here, and my position is it is not. What would be your argument about why it isn't owing? Why it isn't what? It's not owing. What are your arguments about why it would not be owing? Why is deference not? Number one, because there was a D1 violation here in the sense that they applied the wrong standards. One example is the one we just discussed, which is they didn't weigh in the balance on the issue of prejudice, all of the mitigating evidence, and most importantly, the Mount Alabama Industrial School for Negro Boys evidence. If you look at their statement that was alluded to earlier, that's nowhere mentioned. They mentioned the prison evidence, so that's a major problem, and then as Judge Bybee said, the evidence of institutional adjustment is nowhere put into the balance, nor are the mitigating aspects of the government's so-called rebuttal evidence put into the balance. So you have a D1 violation there because they're using the wrong standard. A secondary D1 violation is that they quite clearly apply a nexus test to their analysis in dismissing the mitigation evidence here. So those are two separate distinct but cumulative ways in which the D1 deference should not be granted, and then there's also a D2 problem here because their assessment of factual issues, important factual issues like were these counsel acting tactically, that's a factual determination, and if you look at the record, they were not acting tactically. There's no evidence in this record that either one of these lawyers were adopting the tactics that the Supreme Court ascribed to them. They said in their testimony that their theory, the primary counsel who testified and also the lead counsel whose declaration was admitted into evidence, said that their theory was lingering doubt, and they also said that in terms of their penalty phase theory it was we were looking for good deeds, that was going to be the basis for our penalty phase defense. The testimony is quite clear, and yet the California Supreme Court went off on saying, well, their penalty theory was really to circumscribe Mr. Andrews' background. There's no evidence that was their theory, number one, and number two, given the evidence the government put in in aggravation, there was no way they were going to circumscribe Mr. Andrews' background. The jury heard evidence of three homicides. They heard evidence of a prior homicide and two violent felonies. So the idea that these lawyers were adopting a strategy here of trying to limit the amount of aggravation that the government was going to use is simply not supported by the record. Yes, counsel, I want to ask the same question that I asked the state counsel about the statement in Wiggins about the one juror theory. Do you agree with the state that that is limited to Maryland's rule and is not applicable in California? I absolutely disagree with that analysis. The focus has to be what's the standard for preventing a death penalty, and the standard in California is could they get a death verdict here. They cannot get a death verdict if even one juror says that a death verdict is not applicable. And what is the procedure in California? Can you retry it? That's what the state counsel said. Yes. Yeah, they can retry it. You have to retry the penalty phase as well in order to get this before the same jury? And when I say retry it, you're only retrying the penalty. If the jury convicts him and hangs on penalty, they get to retry the penalty. Before a different jury? Always before a different jury. Okay. So under the state's analysis. So in California, you don't have to have the same jury here, both the guilt phase and the penalty phase? You don't have to. That's the presumptive procedure. So California could continue to try to do this until it got a unanimous verdict one way or the other? They could, but under the state's analysis, that would mean I could never show prejudice because I would hypothetically have to show that ad infinitum, there would be some jury out there that if they kept trying and trying and trying, they could ultimately get a death sentence. You have sort of the same problem in the inverse as they have. That is that you're not going to be able to show that you can get 12 unanimous jurors to find your client not worthy of the death penalty. As long as there's one juror who's a holdout for the death penalty, you have exactly the same problem. You have a hung jury. Well, we have a hung jury, but we also, more importantly, do not have a death sentence. And I think that's the focus of the cases which cite the one-juror rule. And in a Strickland context, the latest case, the Davis case, the U.S. Supreme Court cites that one-juror rule. So in California, it's a victory or you escape death if you can convince one juror not to impose it. Now, theoretically, they may try it again. Practically speaking, things happen when a jury hangs. And so it's my position that it cannot be the rule that in order to show prejudice in California, you have to show that even if the government decides to hold 20 subsequent penalty trials, that you would have to show that in each one of those hypothetical situations, that at least one juror in that second or third or fourth or tenth trial would not impose death. I think that's very tenuous and stretches the idea of showing prejudice beyond anything that the Supreme Court cases suggest. Your time has expired. I have one quick question, if you don't mind, which is about the California Supreme Court case and how you interpret it. They said that the mitigating evidence had to be conclusively and unambiguously mitigating. Yes. So what is your interpretation of what they meant by that in the context of either prejudice or ineffective assistance? Well, I think they are imposing a restriction there similar to the Arizona line of cases and very comparable to Tannard and Smith, where they are qualifying whether or not they will give any weight to a mitigating piece of evidence in two ways. It's got to be conclusively mitigating and there has to be a nexus to the crime. And both of those requirements are inconsistent with governing. Well, where are you getting a nexus to the crime part from? The nexus to the crime. They did say at some points it wasn't connected to the crime, but they did talk about it. They didn't say that it's simply out the window. It would have been stronger if it did, as I understand what they're saying. They said on page, I'm looking at pin side page number 493, moreover, there was no compelling connection between the mitigating evidence not introduced at the penalty phase and the crimes. So that's a nexus test. Yeah, but it's moreover. It's another thing. Well, it's another thing, but it suggests you're not giving it any weight. And I think to answer your question, Judge Thomas, I think it's an improper application of adding to be imposed and to Martin Smith to be imposing those kind of. All right. Thank you. Good for a benefit. I'd like to start by picking up on the last point of a nexus test in California. There is no nexus test in California. The California Supreme Court went through all of the aggravating mitigating evidence. The court clearly considered the aggravating mitigating evidence. And it's the sum and substance of the court's opinion. There's an Arizona line of cases from this court because Arizona used to have a nexus requirement. The mere fact that the court said, moreover, we don't see the connection, was in direct response, as we pointed out in the briefing, to the argument that the petitioner had made to that court that there was a nexus between the crimes and the mitigating evidence. So the California Supreme Court cited the Fourth Circuit's decision in Wiggins, I think, at least four times. And subsequent to that decision, Wiggins was reversed by the Supreme Court. And I'd like to know your position or your view on how that affects the California Supreme Court's application of Strickland here. It doesn't adversely affect this court's assessment of the reasonableness of the California Supreme Court's decision because, as the United Supreme Court has said, the Supreme Court's decision has to be assessed on the basis of the cases that the court had clearly established at the time that the court rendered its decision. So the fact that the U.S. Supreme Court had not yet reversed Wiggins means what the court said in Wiggins, the California Supreme Court didn't have the benefit of that and could not have unreasonably applied that. So to the extent that the court applied the circuit case instead, it just goes to show that it could not have unreasonably applied a case that did not yet exist. And so that's what the U.S. Supreme Court has said about that. And so there isn't anything improper about the court having relied at the time on the circuit case that was on the books. Also, I'd like to point out, with respect to the attorneys in the case, that lead counsel was deceased at the time of the evidentiary hearing. The declarations were extremely limited and general, and the presumption of competence applies to that attorney. Miller testified that he was the junior attorney on the case, that Miller was the one with the tremendous amount of experience, that, I'm sorry, that Lenore was the one with the tremendous... Miller certainly was evasive on questions of strategy. It had been 10 years, and he certainly did admit that he did not know what all the strategy was supposed to be. And he also said that lead counsel was... It was hard to see it once Mr. Lenore argued either. Well, Your Honor, Mr. Lenore argued that, in comparison to the Hillside Stranglers, this case was not... they received life without parole sentences, and therefore, in this case, the juries should do the same thing. Mr. Lenore argued that the petitioner was very young when he committed the earlier crimes, and so the jurors should look at the influence that the people that he'd been hanging out with had on his life. He also argued that the petitioner, that the jury had enough information, and because of what he'd experienced with the people who had the bad influence, that they should spare his life. He did not have... the court was... the California Supreme Court was free to and did reasonably look at the arguments that he made. There were standards in effect at the time that California had recognized. Should counsel have conducted at least a mental review? There's no freestanding requirement that counsel conduct a mental health review. There needs to be triggering information in order to put counsel on notice that he needs to do that. Otherwise, the rule would be that counsel has to do that in every case, and that's simply not the rule. And the U.S. Supreme Court has said that it eschews rules of that nature, strict rules in strickling cases, and that they're not going to be applying hard and fast rules to counsel's performance. So here we have no triggering information that counsel had that should have prompted them to conduct an investigation into mental health. But leaving aside the mental health, what about the fact that they did no real investigation into what had happened to this person as a child, and I'm defining child to mean up to the age of 18? They basically didn't do that. They spoke to his mother, period, at the end. They did speak to his mother and Andrews himself. At the end. I'm sorry? That's all they did, right? Well, they had no reason to suspect that there was this kind of mitigating evidence available. But that's witness, right? I mean, the whole point is you're supposed to at least try and find out. Your Honor. Did they ask him where were you from the time you were 14 to 16? Do we have any evidence they did that? Or what happened to you there? Or did anybody ever beat you? Were you treated badly by anybody? Do we have any evidence they ever did any of that? We don't know the answer to that because Mr. Lenore was deceased by the time of the hearing. Right. So we don't know about the conversations that they had. So it would not be the presumption of confidence is that we presume that counsel had conversations with him in a confident fashion. We don't presume that counsel performed ineffectively with respect to those conversations. And Miller was totally in the dark about any of this? Miller specifically testified. He didn't say he was totally in the dark, but he specifically testified that Lenore was the one with a closer relationship with the petitioner, that he was the one who communicated with him most frequently, and he was the one who was lead counsel in charge of making the decisions. And he even said that when they would sometimes disagree about things. Let me ask the question this way. If they had that information, would it have been reasonable not to use it? Would it have been a competent decision not to use it? If they had had the information about the prison, the elder men's institution. Let's just talk about Miggs. Forget the other prisoners. Well, Your Honor, as the evidence you're hearing from the state court bears out, it doesn't necessarily mean that there would be a more favorable result. That's not what I'm asking you. What I'm asking is if they had the information, is there any world in which it would have been reasonable not to use it? It depends on whether or not they also knew about the rebuttal aggravating evidence that would be triggered in response. But they couldn't have known at the outset what the rebuttal evidence was going to be. It's not like they made the decision not to use it after it turned out that they didn't put this evidence on, when they could have put the evidence on, the aggravating evidence. They certainly knew that he had a criminal history, and they certainly would have known about the crimes that were the stipulated aggravating evidence in the case. And that includes the – And it's therefore reasonable to do no investigation? No, Your Honor. The reason that they didn't do the investigation is because they didn't have any triggering information, and Mr. Andrews, the petitioner, did not tell them anything about what he'd experienced, and that's undisputed. So unless there's some freestanding requirement that counsel needs to go and investigate the previous incarceration of every defendant, then there has to be some reason that they would have looked at that potential area of mitigation. And here, the petitioner still has not pointed to anything that counsel was aware of or that he should have been aware of that should have prompted them to look into that area of potential mitigation. And so without that, it was reasonable for the California Supreme Court to find that the absence of triggering information meant there was no duty for them to go look for potential mitigating evidence of the Alabama institutions. Thank you, counsel. Thank you both for your arguments this morning or this afternoon. This case will be submitted for decision and will be in recess for the afternoon. Thank you.
judges: Thomas, Gould, Berzon, Rawlinson, Bybee, N.R. Smith, Murguia, Nguyen, Watford, Owens, Friedland